THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | **EX PARTE** |
| | * | **SEAL** |
| Plaintiff, | * | |
| v. | * | CIVIL ACTION NO: 15-0484-CB |
| | * | |
| Real Property located at 14 Marilyn | * | |
| Court, Park City, UTAH, 84060, and | * | |
| All Appurtenances and Improvements | * | |
| thereto, | * | |
| | * | |
| Defendant. | * | |

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

COMES NOW the United States of America, by and through Kenyen R.

Brown, United States Attorney for the Southern District of Alabama, and Alex F.

Lankford, IV, Assistant United States Attorney, and brings this verified complaint

for civil forfeiture in rem, with the following allegations:

## NATURE OF THE ACTION

1.      This is a civil action for forfeiture brought against the below-referenced

defendant *in rem*, pursuant to:    1) 18 U.S.C. § 981(a)(1)(A), which subjects to civil

forfeiture any property, real or personal, involved in a transaction or attempted

transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to

such property; 2) 18 U.S.C. § 981(a)(1)(C), which subjects to civil forfeiture any

property, real or personal, which constitutes or is derived from proceeds traceable to

a violation of any offense constituting "specified unlawful activity", or a conspiracy to commit such an offense, which includes a violation of 18 U.S.C. §§ 1341 and 1343, mail and wire fraud.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. §1345, and over an action for forfeiture *in rem* under 28 U.S.C. §1355(a).

3.     Venue is proper in this Court pursuant to 28 U.S.C. §1355(b)(1)(A), as the district in which acts or omissions giving rise to the forfeiture occurred, and 28 U.S.C. §1395(b)(1)(B), incorporating §1395(a), because the action accrued in this district.

## THE DEFENDANT *IN REM*

4.     The defendant *in rem* is 14 Marilyn Court, Park City, Utah, and more particularly described as:

> **LOT 72, EAGLE POINTE SUBDIVISION PHASE IV, ACCORDING TO THE OFFICIAL PLAT THEROF ON FILE AND OF RECORD IN THE SUMMIT COUNTY RECORDER'S OFFICE.**

5.     According to records in the Office of the Recorder, Summit County Utah, Venport Holdings, LLC, holds title to the defendant property.

## SUPPORTING FACTS

6.     The facts and circumstances supporting the forfeiture of the defendant *in rem* are set forth in the Declaration of IRS/CI Special Agent Michael Coleman, attached hereto as Exhibit 1 and incorporated herein by reference as if fully stated.

## COUNT ONE (18 U.S.C. § 981(a)(1)(A))

7.     Plaintiff adopts and re-alleges paragraphs 1 through 6 above as if fully set forth therein.

8.     Based on the facts and circumstances set forth in Declaration of IRS/CI Special Agent Michael Coleman, the defendant real property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), which subjects to forfeiture to the United States any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957.   More specifically, the defendant property is subject to civil forfeiture, based on:

a)     18 U.S.C. § 1956 (a)(1)(A)(i), which makes it an offense to conduct or attempt to conduct a financial transaction affecting interstate or foreign commerce, or using a financial institution whose activities affect interstate or foreign commerce, involving the proceeds of some form of unlawful activity, which in fact involves the proceeds of a specified unlawful activity, to wit: mail and wire fraud, knowing that the property involved in the transaction constitutes the proceeds of

some form of unlawful activity, with the intent to promote the carrying on of a specified unlawful activity; or,

b)      18 U.S.C. § 1956(a)(1)(B)(i), which makes it an offense to conduct or attempt to conduct a financial transaction affecting interstate or foreign commerce, or using a financial institution whose activities affect interstate or foreign commerce, involving the proceeds of some form of unlawful activity, to wit: possession with intent to distribute a Schedule I controlled substance, to-wit: mail and wire fraud, knowing that the property involved in the transaction constitutes the proceeds of some form of unlawful activity, and knowing that the transaction was intended to conceal and disguise the source, ownership, nature, location and control of the proceeds of the specified unlawful activity; or,

c)      18 U.S.C. § 1957, which makes it an offense to knowingly engage or to attempt to engage in a monetary transaction, by, through or to a financial institution affecting interstate or foreign commerce, where the transaction involves criminally derived property having a value greater than $10,000.00, and where the property is in fact the proceeds of specified unlawful activity, to wit: mail and wire fraud; or,

d)      18 U.S.C. § 1956(h), which makes it an offense to conspire to commit any offense described in Sections 1956 and 1957.

4

## COUNT TWO (18 U.S.C. § 981(a)(1)(C))

9.      Plaintiff adopts and re-alleges paragraphs 1 through 8 above as if fully set forth therein.

10.     Based on the facts and circumstances set forth in Declaration of IRS/CI Special Agent Michael Coleman, the defendant property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity", or a conspiracy to commit such an offense, which includes a violation of 18 U.S.C. §§ 1341and 1343, mail and wire fraud.

**WHEREFORE**, the United States of America requests that the defendant be forfeited and condemned to the United States of America; that the United States be awarded its costs and disbursements in this action and that the United States be

granted such further relief as this Court deems proper and just.

                                     Respectfully submitted,

                                       KENYEN R. BROWN
                                       UNITED STATES ATTORNEY

By:    _____
                                       Alex F. Lankford, IV (LANKA0026)
                                       Assistant United States Attorney
                                       63 S. Royal Street, Suite 600
                                       Mobile, Alabama 36602
                                       Telephone: (251) 441-5845
                                       Facsimile: (251) 441-5051
                                       E-mail: alex.lankford@usdoj.gov

## **VERIFICATION**

I, Michael Coleman, Special Agent, United States Department of Treasury, Internal Revenue Service, Criminal Investigation (IRS-CI), declare and verify as follows:

I have read the foregoing Verified Complaint *in Rem*, know the contents thereof, including my declaration submitted in support of this action, and I hereby verify and declare, under penalty of perjury, pursuant to 28 U.S.C. §1746, that the matters contained in the Verified Complaint are true and correct to the best of my knowledge, information, and belief.

Michael Coleman, Declarant, IRS/CI

## CERTIFICATE OF SERVICE

On the 29th day of September 2015, I certify that pursuant to Supp. R. For Adm. M. and Forf. Claims G(4)(b), I sent the attached filed the attached Complaint UNDER SEAL with the Court.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

By: _____
Alex F. Lankford, IV (LANKA0026)
Assistant United States Attorney
63 S. Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845
Facsimile: (251) 441-5051
E-mail: alex.lankford@usdoj.gov

8

**EX PARTE**
**SEAL**

## DECLARATION IN SUPPORT OF
## CIVIL COMPLAINT AND REQUEST FOR RESTRAINING ORDER

I, Michael Coleman, Special Agent, United States Department of Treasury, Internal Revenue Service, Criminal Investigation (IRS-CI), declare as follows:

### AGENT BACKGROUND

1.    I am a Special Agent with IRS-CI and have been so employed since July 2000. I am currently assigned to the Oakland Field Office, Fresno, California Post of Duty. Since beginning my duties as a Special Agent, I have been assisted by senior and experienced IRS-CI Special Agents. My responsibilities include the investigation of possible criminal violations of Internal Revenue Laws, the Bank Secrecy Act, the Money Laundering Control Act (Title 18, United States Code), and related offenses.

2.    My undergraduate education includes a bachelor's degree in business with an emphasis in accounting. In addition, I received intensive training in law enforcement at the Federal Law Enforcement Training Center in Glynco, Georgia, to become a Special Agent. I have also been trained in the criminal procedures related to searches and seizures. Prior to becoming a Special Agent, I was a staff accountant at a California based Certified Public Accounting firm.

3.    Since 2001, I have personally conducted or assisted in numerous investigations, including individuals receiving income from illegal sources. The charges involved in these investigations have included, but are not limited to, money laundering (Title 18, U.S.C. §§ 1956 and 1957). I have participated in the execution of search warrants and have also presented probable cause in affidavit form on numerous different occasions to secure a Federal search

# EXHIBIT 1

and/or seizure warrant.

4.      I have attended over 700 hours of training in various aspects of criminal investigation as well as classes and seminars dealing specifically with structuring, money laundering, seizure, forfeiture, and financial investigative techniques used in financial and narcotic investigations.

5.      I have received training and have collaborated with other law enforcement agencies in investigations involving the unlawful possession and distribution of controlled substances, and I am familiar with Federal laws involving their illegal purchase, distribution and possession.

6.      I am presently involved in an ongoing criminal investigation of, inter alia, individuals identified as **CHARLES BURTON RITCHIE** (hereinafter RITCHIE), and **BENJAMIN EDWARD GALECKI** (hereinafter GALECKI), among others.  This investigation is ongoing and I am being assisted by agents with the DEA and other law enforcement agencies.

7.      Based on my training and experience in conducting financial investigations, I am familiar with the methods and practices used by individuals involved in financial crimes and illicit activities, such as drug trafficking, which generate large amounts of income.  These methods include the use of businesses as "fronts" in an attempt to legitimize and conceal their activities.

8.      From my training and experience, individuals engaged in illicit activities and/or money laundering of illicit funds, will routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic institutions, and others, through all manner of financial instruments.

9.      Also based on my training and experience, I know it is common for persons engaged in illegal activity to move the proceeds from illicit activities through multiple bank accounts and financial institutions, to layer the money in a way to provide insulation from detection and to give the money the appearance of legitimacy.  This is done in an attempt to obfuscate the paper trail and further disguise the true nature and source of the monies.

10.     The facts laid out have come primarily through my own review of records provided by financial institutions, documents obtained from the execution of Federal Search Warrants, and banking records.  Unless stated otherwise, I have personal knowledge of the matters set out in this affidavit.  To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me through my own review of the documents discussed in this affidavit, and through reliable law enforcement sources, including discussions with other law enforcement agents, which causes me to believe the following information to be true.

11.     Because this declaration is being submitted for a limited purpose, I have set forth only the facts that I believe are necessary to comply with Supplemental Rule G(2) of the Federal Rules of Civil Procedure, which requires that the United States "state sufficiently detailed facts to support a reasonable belief that it will be able to meet its burden at trial." I have not set forth all of the information revealed by the investigation.

**INTRODUCTION**

12.     This declaration is submitted in support of the United States' civil forfeiture complaint and request for a Restraining Order for **14 Marilyn Court, Park City, Utah 84060, and any and all improvements thereto.**

3

13.     On March 15, 2010, a business named Zencense Incenseworks, LLC, registered

with the Florida Depart of State, Division of Corporations.  On May 29, 2012, the company

changed its name to ZIW, LLC.  (The name ZIW will be used when referring collectively to

these two businesses.).  Based upon information obtained by law enforcement officials, it has

been determined that RITCHIE and GALECKI each had an ownership interest in these

businesses.  RITCHIE typically signed ZIW contracts as the "Managing Member" or "Member"

of ZIW.  Investigation has revealed that the only source of income for these businesses was the

manufacture and sale of mislabeled synthetic smokeable drugs (commonly referred to as

"Spice," "Incense" or "Potpourri").[1]  These drugs were sold by ZIW to retail establishments

throughout the United States, to include the Southern District of Alabama.  Typically, ZIW sold

the drugs to retail establishments in small packages which were then sold to individuals.  ZIW's

retail customers included such businesses as tobacco shops, head shops, and porn stores.  ZIW

was headquartered in Pensacola, Florida.

14.     On December 1, 2012, RITCHIE, as "Manager" of ZIW entered into a written

"Security Agreement," referenced in the document as an "Asset Purchase Agreement," with

Anthony Nottoli[2], then the Manager of ZenBio, and the owner of a California business named

BioNaturals.  ZenBio, LLC had registered with the state of Florida on November 20, 2012.

---

[1]    The United States Food and Drug Administration ("FDA") is the agency of the United States
responsible for, among other things, enforcing the provisions of the Federal Food, Drug, and
Cosmetic Act ("FDCA"), 21 U.S.C.§301 *et seq*.  The FDA's primary purpose in enforcing the
provisions of the FDCA is to protect the public health.  The FDA's responsibilities include
regulating the manufacturing, labeling, and distribution of drugs shipped or received in interstate
commerce.  The responsibilities of the FDA include preventing drugs that were not approved for
marketing or sale, or which were improperly packaged and labeled, from reaching the
marketplace.  *See also* §§331(a) and 333(a)(2).

[2] Nottoli has entered a guilty plea in the Eastern District of California to mislabeling and
smuggling i/c/w ZenBio and XLR11.

4

Nottoli also executed a written "Promissory Note" on December 1, 2012, in which he agreed to pay ZIW $3,600,000 in payments over a 36 month period. The Note was for the transfer of the ZIW product line.

15.     ZenBio then operated in exactly the same manner as ZIW had, maintaining many of the same employees as ZIW, and maintaining many of the retail customers that had done business with ZIW. Although RITCHIE and GALECKI claimed to have sold their ZIW "product line" to ZenBio, evidence presented in this affidavit will make it clear that they continued to received substantial profits from the business, and that the revenues of ZenBio were from the same illicit source as those received by ZIW. RITCHIE and GALECKI, as well as others intended to defraud and mislead individuals and government authorities regarding the products' status as a drug, with the purpose of avoiding regulation over the drugs and enabling themselves to continue selling the drugs in exchange for money.

16.     On December 11, 2012, RITCHIE and Nottoli entered into an "Amendatory Agreement" which stated that ZIW's inventory, customer list and data base would be transferred to ZenBio. It further provided that the inventory would be valued at $1.00 per gram for "packed product" and $500 per kilogram for "bulk merchandise." RITCHIE signed as the "Managing Member" for ZIW and Nottoli signed for BioNaturals and ZenBio. Immediately after December 11, 2012, ZenBio's offices moved from Florida to Robertsdale, Alabama as a result of the December 11, 2012, change in Florida's laws/regulations making XLR11, the chemical imported from China which was used in the production of ZIW's--and subsequently ZenBio's-- products, a controlled substance.[3] ZenBio continued, as ZIW had previously done, to use XLR11 in the

---

[3] On May 16, 2013, DEA scheduled XLR11 as a schedule I controlled substance based, in part, on evidence from the Center for Disease Control and Prevention establishing a causal link between human consumption of XLR11 and severe kidney damage.

manufacturing of its product. The offices of ZenBio remained in Robertsdale until May 2013. However ZenBio's manufacturing facility moved from Pensacola to Millbrae, California in November 2012.

17.     In an attempt to defraud the FDA, other law enforcement and the public, the drug sold by ZIW and subsequently ZenBio was marketed and distributed as "spice," "incense" and/or "potpourri" under such names as "Headhunter," "Bizarro," "Orgazmo" and "Neutronium," among others, and the packets of drugs typically contained labels stating, "Not for Human Consumption." The contents of the packets of drugs *could not* be viewed from the outside of the package because they were contained in a sealed, dark colored plastic bag, with the exception of the drug "Sonic Zero," which was a clear liquid packaged in a small glass vial. Typically legitimate potpourri is packaged for retail sale in clear bags so the purchaser can view the product. Some of the shipments of XLR11 shipped from China to ZIW, and subsequently ZenBio, used in the manufacturing process, and the contents of the small packets of drugs they manufactured, were seized by both state and federal law enforcement. Thereafter, they were tested by chemists who determined that they contained the chemical XLR11, also known as 5-FUR-144.

18.     Evidence obtained during the course of the investigation makes it clear that both RITCHIE and GALECKI were aware that the product was, in fact, a mislabeled synthetic smokeable drug that was designed and sold specifically to be smoked by end users in the same manner as marijuana. Given this fact, the product was clearly mislabeled in an effort to thwart law enforcement and perpetuate the fraudulent scheme. The mislabeling relates to the fraudulent

representations on the packaging, which did not indicate that the product contained XLR11, and claiming it was "Not for Human Consumption," among other violations of 21 U.S.C. §331(a). [4]

19.     This unlawful scheme was furthered through the shipping of the mislabeled product by ZIW and ZenBio to retail establishments via the U.S. Postal Service and other commercial interstate carriers, to include but not limited to UPS and FedEx, in violation of 18 U.S.C.§ 1341 (mail fraud).  It was also furthered by emails and wire transfers, in violation of 18 U.S.C.§ 1343 (wire fraud).  All of the proceeds received by RITCHIE and GALECKI from ZIW and ZenBio were generated as a result of these activities.

20.     As previously mentioned, ZenBio relocated to Robertsdale, Alabama in December 2012.  All payments to RITCHIE from this point forward were initiated, either directly or indirectly, from the Southern District of Alabama.[5]  The payments to RITCHIE were made by check and wire transfer.  On several occasions, after payments were made to RITCHIE, he then forwarded a portion of the funds to GALECKI.  All of the payments from ZIW and ZenBio, as well as those made to GALECKI by RITCHIE, represented proceeds from the illegal scheme set forth above, which included drug mislabeling, mail fraud, and wire fraud.

---

[4] Said drugs were misbranded in the following respects:  the drugs' labeling did not bear adequate directions for use and did not bear adequate warnings as required by law, in violation of 21 U.S.C.§352(f);  the drugs' labeling was false and misleading in at least one particular manner, including but not limited to the following, in violation of §352(a);  the drugs were falsely labeled in a manner indicating that they were not for human consumption, when in fact such drugs were intended for human consumption;  the drugs were sold as "spice," "herbal incense," "pot-pourri," and under other false and misleading names when in fact the products were intended for use as drugs for human consumption and to affect the structure or any function of the body;  the drugs were packaged with labeling which failed to identify accurately the package's contents and intended use; and the drugs' packaging did not bear a label containing the name and place of the business of the manufacturer, packer, and distributor, in violation of §352(b).

[5] Prior to this move from Florida, ZIW had shipped drugs to the Southern District of Alabama.

21.     Each transaction identified in this affidavit individually involved an amount greater than $10,000. All of the banks discussed in this affidavit are financial institutions as defined in 31 U.S.C.§ 5312(a)(2), and all are federally insured. Mail and Wire Fraud (18 U.S.C. §§1341 and 1343) are Specified Unlawful Activities (SUAs) under 18 U.S.C. §§1956(h) and 1957. As such, all payments in excess of $10,000 to and from RITCHIE, including those from RITCHIE to GALECKI, with these proceeds, were violations of §§1957 and 1956(h).[6] This includes all such payments made to RITCHIE while the business operated in the Southern District of Alabama. The evidence detailing these violations will be set forth in subsequent sections of this affidavit. The tracing discussed below shows proceeds from the sale of mislabeled drugs containing the chemical XLR11 were deposited into quasi-business accounts and then paid to bank accounts controlled by RITCHIE. Those funds were then moved, sometimes once, sometimes more than once, ending up in a bank account in RITCHIE's name. All of the monies deposited into RITCHIE's account used to pay for the defendant real property were involved in or can be traced to illegal proceeds.

22.     As detailed below, I have probable cause to believe that the defendant real property was involved in or traceable to violations of 18 U.S.C. §§ 1956(h) and 1957, or is derived from proceeds traceable to a violation of an offense constituting "specified unlawful

_____

[6] Section 1956(h) is violated when someone conspires to engage in certain kinds of financial transactions commonly known as money laundering. More specifically, §1956(h) is violated when two or more persons in some way agree to commit a money laundering offense defined in §§1956 or 1957; knew the unlawful purpose of the plan; and voluntarily participated in the agreement.

Section 1957 is violated when one knowingly engages or attempts to engage in a monetary transaction; knowing the transaction involved property or funds that were the proceeds of some criminal activity; the property had a value of more than $10,000; the property was in fact proceeds of specified unlawful activity; and, the transaction took place in the United States.

activity", or a conspiracy to commit such an offense. [7]  As such, the defendant property is subject

to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), which subjects to civil forfeiture any property,

real or personal, involved in a transaction or attempted transaction in violation of §§ 1956(h) and

1957, or any traceable to such property. It is further subject to civil forfeiture pursuant to 18

U.S.C. § 981(a)(1)(C), which subjects to forfeiture any property, real or personal, which

constitutes, or is derived from proceeds traceable to a violation of any offense constituting

"specified unlawful activity", or a conspiracy to commit such an offense.

### BACKGROUND OF SYNTHETIC DRUGS

23.     In recent years, individuals have manufactured and trafficked in mislabeled

smokeable synthetic drugs, many times known on the street as "Spice," "incense," or

"Potpourri," popular euphemisms for these products.  This drug is typically ingested, most times

in an attempt to gain similar effects as when ingesting THC (tetrahydrocannabinol), the

psychoactive ingredient in marijuana, which is an organic substance.  From approximately mid-

2012 until approximately mid-2013, XLR11, also known as 5-FUR-144, was one of the most

commonly identified chemical contained within seized smokeable synthetic drugs.  The creation

or manufacture of these drugs can be broken down into the following general steps:  importing of

chemicals from pseudo-legitimate companies, usually located in China, via common commercial

carrier into the United States, under false or misleading descriptions listed on manifests and bills

of lading; diluting the chemical and affixing the synthetic solution to a herb-like carrier medium

(herb); drying of treated carrier medium - now a smokeable synthetic product; application of

flavoring to bulk product; and packaging for wholesale or retail level distribution.  The most

common types of retailers are convenience stores, Smoke shops/Head shops and Adult stores.

---

[7]  Violations of wire fraud and mail fraud (in violation of 18 U.S.C. §§ 1343 and 1341)
constitute "specified unlawful activities" (SUAs) as defined in 18 U.S.C. §§ 1956(c)(7)(A).

24.     At all levels of smokeable synthetic products and trafficking there can be found a strong and concerted effort to create and perpetuate an illusion of legality surrounding the manufacture, sale and use of these products.  Typically the products are mislabeled/misbranded.  These misleading names and markings have been utilized since these products first appeared in the United States and originally were intended to avoid the product being classified under drug definitions, and therefore subject to the Federal Food and Drug Administration (FDA) testing and approval process, as well as regulations pertaining to labeling.

25.     Users of these products have reported effects similar to, but often greater than, marijuana, a hallucinogen, to include, but not limited to, paranoia, panic attacks, increased heart rate and increased blood pressure.  Since the products have been readily available around the United States, a number of deaths have been secondarily attributed to their use.

**ZIW, BioNaturals, and ZenBio**

26.     The corporate paperwork for ZIW, LLC, filed with the Florida Secretary of State listed the business address as 744 E. Burgess, in Pensacola, Florida, and listed RITCHIE as the sole managing member.[8]  The annual corporate report filed September 10, 2012, included the addition of Crystal Henry[9] and GALECKI as managers.  The LLC paperwork for ZenBio, on file with the Florida Secretary of State, with an initial listing of November 20, 2012, lists Crystal Henry

---

[8]  RITCHIE was also the previous owner and president of the Psychedelic Shacks in Pensacola, Florida.  Psychedelic Shack operated three retail shops in the Pensacola area known as head shops which were known by law enforcement to sell ZIW's brand name spice products prior to December 11, 2012.

[9]  Henry, a former Zencense employee and subsequently the ZenBio bookkeeper, entered a guilty plea in the Southern District of Alabama, to a mislabeling and smuggling conspiracy in connection with ZenBio and XLR11.  *United States v. Crystal Henry, et al.* 1:13-CR-00142-WS-C.

as the registered agent, and Nottoli as the sole managing member. It listed the entity address as the same Pensacola address listed for ZIW. On December 12, 2012, a Bank of America business account ending 0988 was opened in the name of ZenBio, LLC, in Pensacola, Florida. ZIW received two payments into their Gulf Coast Community Bank account ending **4740** in December 2012 from ZenBio's Bank of America account ending 0988 (funds were solely from the sale of mislabeled smokeable synthetic drugs).

27.     ZIW manufactured a product they initially referred to as aka "spice," which was subsequently referred to as "incense or potpourri." The product was manufactured by combining acetone with flavoring and a white powdery chemical imported from China, typically XLR11. This mixture was then mixed with leafy organic material. The wet product was dried and then packaged into smaller retail packets. These retail packets were branded various names and shipped to retailers throughout the United States who in turn sold them to the public. Where originally the manufacturing of the synthetic drugs, and the main office, had been in Pensacola, Florida, at some point before June 2012, RITCHIE moved his synthetic cannabinoid manufacturing plant to Las Vegas, Nevada, but the business offices remained in Pensacola.

28.     Due to a change in the Florida law making XLR11 a controlled substance, the main office moved to Robertsdale, Alabama in mid-December 2012. Prior to the move, ZIW had, among other customers, a Mobile, Alabama customer who purchased bulk kilogram quantities of the synthetic drug.

29.     I became involved in this investigation as a result of the November 2012 [10] seizure of a parcel containing 10.99 kilograms of XLR11 in Clovis, California, by the Fresno County Sheriff's Office. The parcel label indicated Crystal Henry, Pensacola Florida, was the

---

[10]   All references to dates and times herein are to approximate dates and times.

11

shipper. FedEx records showed that the parcel shipping was paid for by ZenBio in Pensacola, Florida. The package was addressed to Fresno, California, the business address for Victor Nottoli's smoke shop. The smoke shop specialized in smoking paraphernalia to include pipes, water pipes, rolling papers, and other items which may be utilized for smoking marijuana, as well as synthetic drugs. Nottoli also owned BioNaturals Inc.

30. RITCHIE and GALECKI, through ZIW, caused chemicals, typically XLR11, to be imported from China to Florida and other locations within the United States. They manufactured mislabeled smokeable synthetic products in Pensacola, and later in Nevada, and then shipped the finished product throughout much of the United States by USPS, FedEx, and UPS among other shippers. In September of 2012, Zencense sent two shipments, of one kilogram each, of product from Pensacola to Mobile, Alabama by FedEx. The wholesale price per kilogram of the finished product was $1,500, a steep price had the product been legitimate potpourri.

31. On November 5, 2012, RITCHIE wire transferred $39,000 from his Bank of America account ending **3971**, to an account held by chemical broker Jason Fox[11]. Again on November 20, 2012, RITCHIE wire transferred $121,000 to Fox from the same Bank of America account. Subsequent to receiving the second wire transfer from RITCHIE, Fox sent wire transfers to the Bank of China for the purchase of XLR11 for RITCHIE.

32. Nottoli's emails were received pursuant to a federal search warrant. Below is a partial summary of information contained in the emails, which detail GALECKI's continued involvement in purchasing chemicals used in the manufacturing and production of the products.

---

[11] Fox, an XLR11 broker, subsequently entered a guilty plea in the District of Arizona to a Rule 20 transfer of an Information charging a mislabeling and smuggling conspiracy i/c/w ZenBio and XLR11, which had originally been filed in the Southern District of Alabama.

Between October 24, 2012 and October 25 2012, GALECKI and Susan LNU (who, based on the emails, worked at a chemical distribution company in China) discuss quantity, amounts and price per quantity of an "item" (no name was provided for the item).  They discuss the price for the "item" will be $1,250 a kilogram, and purchasing amounts of 20-40 of the item per week.  Nottoli was copied by GALECKI on the last email.

On October 25, 2012, GALECKI sent wiring instructions to Nottoli by email.  GALECKI mentions a conversation he had with Susan where she has "20" ready to be shipped and is just awaiting the payment.  The full wire transfer detail shows how the money needs to be sent to a company with an address in Hong Kong China.

Between October 19, 2012 and October 26, 2012, GALECKI has an email conversation with Brian Xu (Brian), who, based on the content of the email, is a supplier of chemicals. Brian emails GALECKI the types of chemicals they have.  GALECKI responds by asking if they still have 5FUR-144 (also known as XLR11, and a primary chemical identified by law enforcement used in the manufacturing and production of synthetic drugs by ZIW and ZenBio).  GALECKI forwards the conversation to Nottoli, telling him "here's another guy I have dealt with extensively. He has 20 ready to go".

On October 30, 2012, GALECKI, using the email address "ZencenseBen", sent two emails to Nottoli with wire transfer information for another broker named "Jayson" who is located in Phoenix, Arizona.

On September 20, 2012, William, from LHD (Legal Herbs Direct) Distribution, a Zencense customer and distributor of spice, sent an email to GALECKI at *ZencenseBen @gmail.com*.  Williams want to know why 5FUR-144 is legally not considered to be an analogue when it potentially meets one of the three criteria for being an analogue. GALECKI forwarded the email from William to RITCHIE at burton.ritchie@gmail.com a few minutes later telling RITCHIE he may want to have Adam look at the email. RITCHIE then forwarded the email to Adam Libby at his email address.  (Libby, entered a guilty plea in the SDNY for conspiracy to distribute controlled substance analogues. Libby also entered a Rule 20 guilty plea in the SDNY to Information filed in this district to mislabeling in connection with ZenBio.)  RITCHIE forwarded the email GALECKI had originally forwarded him to Nottoli.

33.    Robert Biggerstaff, who has entered a guilty plea in this district to conspiracy to

mislabel ZenBio's XLR11 products, provided the following information:

a.    Biggerstaff, who had worked for Zencense and later for ZenBio, believed RITCHIE

       had ultimate control and authority over what was printed on the product labels and the

       rules employees were required to follow for affixing the labels.

b. During a trade show in Nevada, RITCHIE had rented a vehicle and driven Biggerstaff
   to one of RITCHIE's warehouses in Las Vegas that had been raided by DEA.
   Biggerstaff and other ZIW employees were advised by RITCHIE and GALECKI to
   not discuss consumption. Biggerstaff felt as if this was a "wink-wink, nudge-nudge"
   type topic because he knew individuals were smoking it. GALECKI always ordered
   the "additive" or the chemical. Eventually, Travis Gross, who was subsequently
   convicted in this district after a jury trial in December of 2014, of conspiracy to
   mislabel the ZenBio products containing XLR11 and of money laundering and
   sentenced to a 13 years, took over ordering "additive," the euphemism they used for
   XLR11. Biggerstaff was taught how to manufacture the product by GALECKI.

c. Customers for the synthetic drugs were recruited by cold calls and word-of-mouth.
   Biggerstaff estimates that 95% of sales were handled over the phone by the call center
   sales staff. They "cold-called" business such as convenience stores, tobacco shops,
   smoke/head shops, and adult stores. No one at ZIW ever tried to sell the product to
   big chain home stores such as Bed, Bath, & Beyond.

d. Jim VAIL, who has subsequently entered a guilty plea in this district to a conspiracy in
   connection with ZenBio's sale of mislabeled drugs containing XLR11, handled
   customer service as it related to law enforcement seizures of shipments. ZIW would
   often break up shipments into smaller amounts to avoid detection by law enforcement.

e. Biggerstaff knew RITCHIE sold ZIW's mislabeled products in the Psychedelic Shack
   stores RITCHIE owned. He believed RITCHIE knew people were smoking ZIW
   products.

34.    The following information was provided by Anthony Nottoli:

a.    In early 2012, Nottoli began purchasing wholesale "spice" products from ZIW for sale in his smoke shop in Fresno, CA.  RITCHIE called Nottoli to negotiate wholesale prices for ZIW "spice."  Nottoli always dealt directly with RITCHIE.

b.    RITCHIE told Nottoli that "ingredients" needed to test 95% pure or better.  RITCHIE would submit a "spoon" of chemical for each 20 kilograms of chemical to AI Biotech for lab testing.  If the tests came back less than 95% pure, RITCHIE told Nottoli the batch would be trashed.  Nottoli knew that purity was only important because Zencense "spice" was being smoked.

c.    In August 2012 RITCHIE called Nottoli and asked him to buy ZIW.   RITCHIE said it "did" $1million per week and that the sale price for business would be $1 million.  Nottoli went to Pensacola, Florida in early October 2012 to tour the ZIW facilities with RITCHIE.  RITCHIE told Nottoli he would be shown the manufacturing process but would only get the "recipe" if he agreed to purchase ZIW.  During the tour, GALECKI showed Nottoli the packaging area and told Nottoli who the vendors were for different components of the "spice".

d.    During this trip RITCHIE showed Nottoli two storage units where RITCHIE kept his reserves, telling NOTOLLI to always keep a large reserve of finished product in inventory.  RITCHIE told Nottoli to rent storage units in the name of someone other than his own.  RITCHIE told Nottoli that "spice" would lay you out for a few hours.  Nottoli believed that RITCHIE knew that employees were smoking ZIW products.

e.   In mid-October 2012, Nottoli leased a warehouse in Adrian, near San Francisco, California.  Biggerstaff was directed by RITCHIE to come to California and teach Nottoli how to manufacture the "spice".

f.   Nottoli knew ZIW used flavoring and not fragrances for the products because the products were meant to be smoked.  ZIW and other companies learned how to use certain language and other techniques to mask the true intentions of their operations.  If ZIW shipments were seized by local law enforcement officers, no one at ZIW really cared.  If seizures were done by "the Feds," they started to worry.

g.   Libby supplied ZIW with the 5-FUR-144 also known as XLR-11 additive for $1,700 a kilogram.   On return from Nottoli's first Pensacola trip, RITCHIE told Nottoli to call Libby because Libby had 100 kilograms of "additive."  Nottoli then ordered 10 kilograms.  When Nottoli called RITCHIE back to tell RITCHIE that he placed the order, RITCHIE called Nottoli an idiot and said that the operation needed all 100 kilograms.  GALECKI and RITCHIE both told Nottoli at one point that the "additive" was 5-FUR-144 or XLR-11.

h.   In approximately October or November of 2012, Nottoli paid RITCHIE $500,000 for the purchase of ZIW's product.  Later, and after the $500,000 payment, RITCHIE owed Nottoli money for Nottoli's part in the bulk manufacturing in California.  In late-October/early-November 2012, Nottoli demanded RITCHIE pay, but RITCHIE said that his accounts had been seized for suspected money laundering and that he could not pay Nottoli.  (Federal law enforcement had, in fact, seized some of RITCHIE's accounts in late July 2012, around the time they searched the Nevada manufacturing location.)

16

i. In November of 2012, GALECKI asked for Nottoli's store address.  The next day Nottoli unexpectedly received 20 kilograms of chemical at the California warehouse and 20 kilograms at his personal residence.  ZIW only sold "spice" products. Customers were retailers such as headshops and smoke shops.  Neither ZIW nor ZenBio ever sold these products to retailers like Bed, Bath, and Beyond.

j. Nottoli was told at some point in a letter from RITCHIE that he was not to go to the manufacturing warehouse he himself had rented.  At some point there was a federal seizure of product in Oakland, California.  Everyone was concerned because it was a federal agency and not a state agency.

35.    In November 2012, RITCHIE, GALECKI and Nottoli began moving synthetic manufacturing operations from Florida to a California warehouse.  GALECKI came to California to oversee the setup of the manufacturing operation.

36.    The process used by ZenBio, as well as its predecessors Zencense and ZIW, in the production of "Spice," "incense" and/or "potpourri" involved combining plant materials such as Damiana and marshmallow leaf with the active chemical ingredient (XLR-11).  Acetone was used in a binding agent.  The fourth ingredient was flavoring typically used in the flavoring of coffees, teas, and medicinal herbs, products that are ingested into the human body.  The flavors purchased included cherry, vanilla, blueberry, lime, and others- not typically used in legitimate potpourri.  Had the products sold by ZenBio/ZIW/Zencense actually been potpourri as claimed, the products would contain some type of fragrance rather than flavoring.

37.    Each of the mislabeled synthetic drugs were misbranded/mislabeled in at least one of the following respects:  the drugs' labeling did not bear adequate directions for use;  the drugs had false and misleading labeling in that they were labeled in a manner indicating they were not

for human consumption when, in fact, the synthetic drugs were intended for human consumption; and the drugs' packaging did not bear a label containing the name and place of the business, the manufacturer, packer or distributor.  RITCHIE and others intended to defraud and mislead government authorities and the public regarding the products' status as drugs for the purpose of avoiding regulation over the drugs and enabling themselves to continue selling the drugs in exchange for money.

38.     On January 16, 2013, DEA Special Agent Wolfe entered Nottoli's smoke shop in Fresno, California, in an undercover capacity.  He asked the employee if they sold "Headhunter." The employee indicated that Headhunter was no longer in production, but they had a similar product called "Bizarro."  The employee also indicated that the owner of smoke shop, Nottoli, had purchased the company that used to produce "Headhunter" and now made the *same product* using the "Bizarro" brand name.  The packages were labeled with the name "Bizarro" and indicated that it had been produced by "Zencense."  They were also labeled "Not for Human Consumption."  The DEA Laboratory later determined that the packages the Agent purchased, in an undercover capacity, contained XLR11.

39.     On or about March 20, 2013, a meeting took place in San Francisco, California between Nottoli, Crystal Henry, GALECKI and RITCHIE.  Per Nottoli, the meeting occurred to allegedly discuss the "transfer" of ZenBio to Henry.

40.     From December 2012 continuing through June 2013, RITCHIE received fourteen distributions, totaling **$8,233,416.58**, from ZenBio and/or BioNaturals, all of which were percentages of sales from the manufacturing and distribution of smokeable mislabeled synthetic drugs.

41.     The following texts and emails were recovered from GALECKI's cellphone,

which was seized from him in January of 2013:

> On May 18, 2012, GALECKI texted chemical broker Jayson Lang's associate, as follows: "Jayson would like you to send me 10 kilos of 5fur-144 *using our FedEx Account number* ending 8238." (Emphasis added)
> On June 29, 2012, "Marshmallow" texted GALECKI stating, "*Rich* ask me yesturday for more I just got a verble confirmation from adam it's 5fur-144…12 kg available let me know how many ? (Emphasis added.)
> On June 29, 2012, GALECKI texted "Sean Marshmallow" stating, "We'll get 10kg. I'll setup *the wire to* go today." (Emphasis added)
> On August 30-31, 2012, GALECKI e-mailed Alice at Caiyuntian, a chemical company in China, telling her that he had transferred $66,050 at the same time he *e-mailed her an order.* (Emphasis added)
> On October 30, 2012, e-mails from GALECKI to Nottoli regarding 10 (kilograms) from Jason Fox for $20,000, along with associated wiring instructions.

## BANKING AND TRACING INFORMATION

42.   Between December 6, 2012 and June 7, 2013, RITCHIE and GALECKI collectively received in excess of $8,000,000 in distributions from the ZenBio business bank accounts. Crystal Henry, under the direction of RITCHIE and others, sent criminally derived proceeds to one of several accounts listed in RITCHIE's name or to an account over which RITCHIE and/or GALECKI maintained control; and RITCHIE used monies received from the illegal proceeds to purchase a vehicle, and the defendant real property, among other assets. All monies received from ZIW, ZenBio or BioNaturals by RITCHIE were from the illegal manufacture and sale of mislabeled drugs.

43.     Because of the number of bank accounts to be discussed, I have summarized them in the chart below.

| Account # | Account Name | Signors | Bank |
|-----------|--------------|---------|------|
| 0988 | ZenBio | Henry | Bank of America |
| 0961 | BioNaturals | Henry | Wells Fargo |
| 5034 | RITCHIE | RITCHIE & his spouse | GCCB |
| 2853 | RITCHIE'S spouse | RITCHIE'S spouse | Wells Fargo- used to pay for RITCHIE's residence |
| 0087 | Zencense ZIW | RITCHIE RITCHIE&spouse | Grand Valley Bank - used to pay for RITCHIE's residence |
| 8029 | RITCHIE | RITCHIE | Zions FNB - used to pay for RITCHIE's residence |

### ZenBio's Bank of America Account ending 0988

44.     On November 29, 2012, a Bank of America (Bank of America) checking account ending **0988** was opened in California in the name of ZenBio.  Based on statements made by Witness #1, a former employee at Zencence and ZenBio, all monies deposited to this Bank of America account were from the sale of "spice" or "potpourri."  Henry, the bookkeeper for ZenBio and a former employee at Zencense, testified under oath in the trial of Travis Gross, *U.S. v. Travis Gross*, SDAL Criminal Number 13-00268-WS, that all funds deposited into this account were from the sale of "potpourri," *see* sworn testimony of Crystal Henry, Trial Transcript, Volume number II at page 340-341.

45.     Witness #1 also indicated that customers who purchased "spice" or "potpourri" (the company's only product) were instructed that one method of payment was to wire payment directly into the company's bank accounts.

46.     In January, 2013, the address for ZenBio changed from Florida to Robertsdale, Alabama.  This switch is consistent with the change in Florida's laws on December 11, 2012, making XLR11- the chemical used in the production of ZenBio's products- illegal.  Henry testified at Travis Gross' trial that she conducted business from the Robertsdale location and sent requests for wire transfers from the ZenBio bank accounts from that location.  In only a four month period from December 3, 2012 through March 31, 2013, total deposits into ZenBio's Bank of America Account ending **0988** amounted to a staggering $25,974,333.13. This account received deposits from cities located all around the United States.

47.     Based on the review of the incoming wires, the second deposit ever made to the Bank of America account was an incoming wire transfer from a customer in Maryland, a purchaser of ZenBio's product "Bizarro."  Zencense bank records show that prior to making the deposits into ZenBio's Bank of America Account ending **0988**, the same Maryland customer had previously sent nine wire transfers to RITCHIE's Bank of America account **3971**.

### BioNaturals Wells Fargo Account Ending **0961**

48.     On January 10, 2013, Wells Fargo (WF) business account **0961**, was opened in the name of BioNaturals by Crystal Henry.  According to Witness #1 and the paperwork she possessed, this BioNaturals account was one of the accounts she provided to customers for deposit of payments for "spice" or "potpourri".   Although the account was closed in mid-February 2013, there are significant funds which flowed out of Account **0961**, and which can be traced to RITCHIE accounts, as set forth in detail below.

### Burton Ritchie Gulf Coast Community Bank Account Ending **5034**

49.     In 2008, Gulf Coast Community Bank (GCCB) account ending **5034** was opened by RITCHIE.  His spouse was added as an additional signor.  Based on my tracing of monies

into GCCB account **5034**, the account received $10,502,196.89 in deposits, from August 6, 2012 through January 25, 2013. All of those funds have been traced to accounts that were funded primarily from monies received from the sale of smokeable mislabeled synthetic drugs, to include RITCHIE'S Account **3971**, Zencense's Account **9047**, and Zencense's Account **4740** (see below for additional information on each of these accounts). RITCHIE wrote twelve checks payable to his spouse from this account, totaling $4,670,000.00, which she deposited to her Wells Fargo Account **2853**.

50. The $4,670,000.00 received from RITCHIE and deposited to Wells Fargo Account **2853** accounted for all but $300.00 of all deposits to this Wells Fargo account. Ritchie's spouse used the money in this account (**2853**) to pay half of the down payment ($100,000.00) on the **defendant real property** in Park City, Utah, located at **14 Marilyn Court**, as discussed below.

RITCHIE'S SPOUSE'S WELLS FARGO BANK ACCOUNT ENDING 2853

51. In July 2012, RITCHIE's spouse opened Wells Fargo Account ending **2853**. She was the sole owner of this account. From September 26, 2012, through October 11, 2012, checks totaling $970,000, drawn on RITCHIE's Gulf Coast Community Bank Account ending **5034**, were deposited in Account **2853**. From October 19, 2012, through November 2012, checks drawn on RITCHIE's GCCB Account **5034** were deposited to his wife's Account **2853** totaling $2,200,000. Those funds were from the sale of "spice" or "potpourri."

52. In late December 2012, a check in the amount of $1,500,000 (drawn on GCC Bank Account ending **5034** held in RITCHIE'S name) was deposited into the account in his wife's name, account ending **2853**.

ZIW'S GRAND VALLEY BANK ACCOUNT ENDING 0087

53. On or about January 08, 2013, Grand Valley Bank account ending **0087**, was opened in the name of C. BURTON RITCHIE and his spouse. This account received three

22

deposits, one from Wells Fargo account ending in **2853** which is in Ritchie's spouse's name (discussed above), and two internal bank transfers from RITCHIE's Grand Valley Bank account ending **0102**. The funds in this account were used in part to pay one half of the purchase of the **defendant real property** in Park City, Utah, located at **14 Marilyn Court**.

54.     In January and February 2013, RITCHIE's ZIW's Grand Valley Bank account ending **0102** sent two wire transfers, totaling $889,000 to RITCHIE's Grand Valley Bank account ending **0087**. Based on my tracing analysis, both of these transfers are traceable to/sourced from ZenBio's Bank of America account ending **0988**.

<u>RITCHIE ZIONS FIRST NATIONAL BANK ACCOUNT ENDING **8029**</u>

55.     On or about January 16, 2013, Zions FNB account ending **8029**, was opened by RITCHIE in his name. In March 2013, RITCHIE's Zions FNB account ending **7351** sent two wire transfers totaling $932,000 to his Zions FNB account ending **8029**. Based on my tracing analysis, this money is traceable to/sourced from ZenBio's Bank of America account ending **0988**.

56.     Based on my review of the bank records and based on my tracing analysis, of the $6,778,416.58 of criminally derived monies deposited into RITCHIE's accounts at Grand Valley Bank account ending **0102** and his Zions FNB account ending **5836**, approximately $6,510,000 was transferred out to at least two other accounts, to include his Zions Frist National Bank accounts ending **7351** and **5919**, in an attempt to obscure the true source and nature of the monies and add a layer of insulation to thwart detection.

**TRACING OF REAL PROPERTY**

**14 Marilyn Court, Park City, Utah 84060**

57.     In January 2013, RITCHIE began negotiations to purchase **14 Marilyn Court** located in Park City, Utah. On January 24, 2013, the Keller Williams, Park City real estate agent

for RITCHIE, sent an email to the escrow officer at First American Title Insurance Company, stating RITCHIE and his wife would like the title of the house to be in the name of "Venport Holdings LLC", and listed RITCHIE as being the registered agent for Venport Holdings LLC. A records search in the State of Florida lists RITCHIE as the Manager of Venport Holdings, LLC.

58.     The total purchase price of the home was $2,949,031.42. RITCHIE paid this total amount with two wire transfers, both conducted on January 28, 2013, from his accounts at Grand Valley Bank account ending **0087** and Zions FNB account ending **8029**, and with a check written from his wife's account at Wells Fargo Bank (ending in **2853**) in the amount of $100,000. The buyers' agreement from First American Title Insurance Company shows the buyer as Venport Holdings, LLC, and was signed by Charles B. RITCHIE, Manager, on January 28, 2013.

59.     In the months following the purchase of **14 Marilyn Court**, RITCHIE made numerous payments totaling more than $250,000 for improvements to this residence, all sourced from his Zions FNB accounts ending **5919** and **7351**. RITCHIE currently lives at this address.

60.     While as noted $100,000 came from Ritchie's spouse's account ending 2853 at Wells Fargo bank, a tracing of deposits to that account reveal all deposits, from September 2012 through January 2013, came from RITCHIE's Gulf Coast Community Bank account ending 5034, which, as mentioned above, is comingled with millions of dollars in proceeds from RITCHIE's "Spice" and "potpourri" business.

61.     RITCHIE's Grand Valley Bank and Zions FNB accounts were 100% funded and

are traceable to/sourced from criminally derived funds from ZenBio's Bank of America account

ending **0988** and/or BioNaturals' Wells Fargo account ending **0961**:

| Bank Name | Date of Purchase | Amount | Form of Payment |
|---|---|---|---|
| Grand Valley Bank | 1/28/2013 | $1,649,031.42 | Wire transfer from RITCHIE'S Grand Valley Bank Account ending **0087** |
| Zions Bank | 1/28/2013 | $1,200,000.00 | Wire transfer from RITCHIE'S Zions FNB Account ending **8029** |
| Wells Fargo Bank | | $100,000.00 | Wells Fargo Bank ending **2853**, signed by RITCHIE's spouse |
| Sum of monies paid for purchase of 14 Marilyn Court | | $2,949,031.42 | |

62.     I believe there is a substantial probability that the United States will prevail on the

issues of forfeiture in this action.  I further believe that a civil restraining order is necessary to

prevent the above **defendant real property** located at **14 Marilyn Court** from being

transferred and /or being otherwise made unavailable for forfeiture.  As stated, this investigation

is ongoing, and I seek to avoid prematurely revealing the facts of this investigation pending

Indictment of RITCHIE and GALECKI.  The premature disclosure of the investigative details in

my declaration would adversely impact the ongoing grand jury investigation of C. Burton

Ritchie and others, due to their involvement in money laundering and a conspiracy to commit

money laundering as set forth in the Verified Complaint.  More specifically, such disclosure

would alert the subjects of the investigation to details regarding its scope and direction, which

may cause them to flee and prevent law enforcement from arresting them.  Premature disclosure

of investigative details may further cause subjects of the investigation to destroy evidence.  I

anticipate they will be indicted in approximately 60 days.  Therefore, I have asked that the

United States take steps to do the following: seek to file and maintain the civil forfeiture

complaint under seal pending their indictment and arrest; delay sending and publishing notice of

this action; seek a civil restraining order to restrain the title holder Venport Holdings, LLC, and

any of its members, including RITCHIE, from encumbering or transferring or disposing of it;

request to unseal the restraining order so that it may be filed in the public records in the county

in Utah where it is located; file a lis pendens.  Pursuant to 28 U.S.C. § 1746, I declare under

penalty of perjury that the foregoing is true and correct, to the best of my knowledge,

information, and belief.

Michael Coleman, Special Agent
Internal Revenue Service
Criminal Investigation

26